FILED

2025 DEC 12 AM 8:45

U.S. DISTRICT COURT
MIDDLE DISTRICT OF TN

# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | | |
|---|---|---|
| **ALIA SAAED,** | ) | **CASE NO:** |
| ____________________ | ) | |
| **I ,** | ) | |
| **-V-** | ) | |
| **UNITED STATES OF AMERICA** | ) | |
| **DEFENDANT.** | ) | |

## COMPLAINT FOR DAMAGES UNDER THE FEDERAL TORT CLAIMS ACT

### I. NATURE OF ACTION

This is a pro se civil action for money damages under the Federal Tort Claims Act.

I brings this action under the Federal Tort Claims Act to recover money damages for injuries proximately caused by federal law-enforcement officials who knowingly pursued a criminal investigation and prosecution that were unsupported by the evidence in their possession and that inverted the roles of abuser and abused in the context of domestic violence and sexual assault. For approximately two years, those officials withheld and concealed exculpatory information from courts, two grand juries, and defense counsel in order to obtain and maintain

arrest and search warrants, secure my pretrial detention, and use the conditions of that detention, including repeated strip searches of a rape victim, to coerce a guilty plea to charges contrary to the known facts. After the case was dismissed in April 2023, Assistant United States Attorney Frank Pennington continued to contact me through my former counsel, including with "requests" that I destroy evidence of his wrongdoing, while publicly running for a judgeship in Chatham County on a platform of having spent his career advocating for survivors of sexual assault and domestic violence and being "trauma-informed."

## II. JURISDICTION AND VENUE

This Court has subject matter jurisdiction under 28 U S C section 1331 and 28 U S C section 1346 b 1.

At all relevant times the federal officers whose conduct is at issue were employees of the United States acting within the scope of their employment as defined in 28 U S C section 2671.

I timely presented an administrative tort claim to the appropriate federal agency under 28 U S C section 2675 a. More than six months have passed without final disposition. Administrative remedies are exhausted.

## II. JURISDICTION AND VENUE

1. This action arises under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1), 2671–2680.

2. This Court has subject-matter jurisdiction under 28 U.S.C. § 1346(b)(1) because I seek money damages from the United States for personal injuries caused by the negligent and wrongful acts and omissions of employees of the United States, acting within the course and scope of their employment, under circumstances where a private person would be liable to I under the laws of the State of Tennessee.

3. I has satisfied the administrative prerequisites to suit under 28 U.S.C. § 2675(a). On [date], I presented a written administrative claim to the appropriate federal agency. More than six months have elapsed without a final written denial, or the agency has issued a final written denial, and this action is timely filed.

4. I timely presented an administrative tort claim to the appropriate federal agency under 28 U S C section 2675 a. More than six months have passed without final disposition. Administrative remedies are exhausted.

5. Venue is proper in the United States District Court for the Middle District of Tennessee under 28 U.S.C. § 1402(b) because acts and omissions complained of occurred in this judicial district, including in Nashville, Tennessee.

6. At the time of the events giving rise to this action, I resided in Nashville, Tennessee, which is within the Middle District of Tennessee. I now resides in North Carolina, but venue remains proper in this district because the acts and omissions at issue occurred here.

## III. PARTIES

7. I , Alia Saaed, am a citizen and resident of Burke Country, North Carolina.

8. Defendant United States of America is sued under the Federal Tort Claims Act for the acts and omissions of its employees acting within the scope of their federal employment.

## IV. FACTUAL ALLEGATIONS

9. I am an adult individual who resided in Nashville, Tennessee beginning on November 1, 2017 .

10. In or about March 2, 2021, FBI Special Agent Savannah Solomon based in Savannah, Georgia opened an investigation focused on my online speech and related communications.

11. From the onset of the investigation, Agent Solomon was told by Athena Georgiadis, the party reporting complainant that the alleged victim, Ramez Sayegh has confessed to "all these crimes" against the me, the intended target of the investigation.

12. On or about March 5, 2021, Assistant United States Attorney joined the investigation.

13. On March 8, 2021, Agent Solomon interviewed Georgiadis and Sayegh and took reports from their phones.

14. In her interview, Georgiadis alleged that I met her boyfriend some number of years ago, had a miscarriage and then falsely accused him of murder. Georgiadis further alleged that I had "followed" he boyfriend to California and Texas and had beat him.

15. Sayegh alleged in his interview that in about 2014, after several years of dating, I became pregnant against his wishes, then requested that he commit a deadly assault against me to kill the fetus, then, falsely accused him of murder to his friends and family, at which time he "guilt dated" me, then later fled California to escape me but I "found" him in Nashville, "followed" him to Texas , at which time he gave up trying to escape and lived with me in Nashville for two years.

16. However, Sayegh and Georgiadis' phone reports contained extensive communications of Georgiadis accusing Sayegh of abuse.

17. Additionally, texts shows that just weeks earlier, a series of events has occured. Georgiadis, about seventeen week pregnant with Sayegh's child at the time, and Sayegh went on a "baby moon." While on their baby moon, according to Gerogaidis' texts to Sayegh, she caught him looking up how to "kill" the child she was carrying. In their texts, Georgiadis expresses anger that Sayegh was seeking out information on killing their unborn child and accuses Sayegh of trying to control her body and states she will never feel safe living him alone with the child. Sayegh responded that they had already discussed his plans, and that she is not giving him credit for the nice things he looks up for the baby.

18. Days later, , according to Sayegh and Georgiadis' text communications, Sayegh announced that he was abandoning Georgiadis financially and stated he would not longer help her with expenses related to the baby while she was pregnant or after the child was born because he intended to buy himself a Porsche. Sayegh then offered to start a GoFundMe to help Georgiadis pay for expenses related to their child. Georgiadis initially expresses horror at his decision, but according to text communications, Sayegh then convinces Georgiadis that he is abandoning her financially because he had a deep emotional need to see her and the baby riding in his Porsche.

19. Furthermore, just days before contacting the FBI, Sayegh and Georgiadis' texts show that Georgiadis discovers that I had been writing online and posting evidence supporting my statements about a decade of abuse I experienced at the hand of Sayegh.

20. Sayegh and Georgiadis' texts show that in response to learning that I had spoken about the abuse I experienced and posted her boyfriend's casually discussions about killing an unborn child I carried, planning to murder my son and raping me, Georigadis became angry that he had betrayed her by traveling to my home while they were dating. Georgiadis, according to her own texts, also being a victim of Sayegh's abuse and just weeks earlier, having caught him looking up how to kill her unborn child while she was well into her second semester, demanded that Sayegh prevent me from speaking further and stated that her friends in New York would never like Sayegh now and stated that my speech about abuse, might interfere in her hopes that Sayegh might get a job in Montreal.

21. Nonetheless, Agent Solomon and AUSA Pennington declined to follow up with Georgiadis about the information in their phone reports.

22. Instead, on or about June 8, 2021, Agent Solomon filed a complaint and sought my arrest and to search my home in Nashville, TN based entirely on Sayegh's hearsay.

23. Solomon did not indicate in her probable cause affidavits that the allegations were hearsay, but instead, simply stated them as her own personal knowledge or knowledge she observed in her investigation.

24. Additionally, Agent Solomon concealed all the evidence in her possession at the time.

25. Agent Solomon's probable cause warrants presented a narrative alleging personal knowledge that I sought to be subject to deadly abuse, falsely accused Sayegh of murder, "found" and "followed" Sayegh to various states, by some means compelled him to sign a contract for wrongs he commited against me, compelled him to confess to murder by taking his phone, and then falsely accused him of killing an unborn child.

26. But for these false statements and omissions the warrant would not have issued because the affidavit would not have established probable cause to search my home.

27. From June until December of 2021, P was held in seven different county jails.

28. From December of 2021, until April of 2023, P was held under house arrest at her parents's home in North Carolina.

29. The federal prosecution was brought in the Southern District of Georgia. The criminal case was dismissed without prejudice in April 2023.

30. Agent Solomon either knew these statements were false or acted with reckless disregard for their truth or falsity.

31. But for these false statements and omissions the warrant would not have issued because the affidavit would not have established probable cause to search my home.

32. Relying on the defective warrant federal agents entered my home on or about June 9, 2021 without valid legal authority.

33. During the search agents remained in My home for several hours searched private areas including bedrooms and personal storage and seized various items of My personal property.

34. I did not consent to the entry or search and did not consent to the seizure of her property.

35. As a result of the unlawful search and seizure I suffered economic loss emotional distress and other damages as described below.

36. Any criminal investigation or proceeding that followed the execution of the warrant has been resolved in My favor and no conviction has resulted from the warrant at issue.

## V. CAUSES OF ACTION

## COUNT ONE

**Malicious Prosecution (Tennessee common law)**

37. At all relevant times, Special Agent Solomon of the FBI, Assistant United States Attorney Pennington for the Southern District of Georgia, and other unknown federal employees were acting within the scope of their federal employment.

38. Acting in concert, these federal employees caused a federal criminal proceeding to be instituted and maintained against I . They did so by preparing and submitting false and misleading warrant applications, presenting false and incomplete information to judicial officers and the grand jury, and by continuing to prosecute I after they had obtained and reviewed electronic and documentary evidence that undermined or destroyed probable cause.

39. The criminal proceeding terminated in My favor when the United States dismissed the charges without prejudice in or about April 2023.

40. At the time of initiation, and at each decision point where federal employees chose to continue the prosecution and to oppose My release from custody or from home confinement, there was no probable cause to believe I had committed any federal offense. Any probable cause that may have existed at the outset was extinguished once the government seized and reviewed My recordings, messages, and other materials that corroborated her account and contradicted M's account.

41. The federal employees acted with malice. Their purposes included silencing My speech about M's abuse, protecting M from exposure and possible liability for his own conduct, and protecting themselves and their offices from embarrassment and potential civil and professional consequences once it became clear that the case rested on false statements supplied by an abuser and repeated by federal officials.

42. As a direct and proximate result, I was deprived of liberty in Tennessee, Georgia, and North Carolina, was incarcerated in jail and then confined under restrictive conditions at her parents' home for approximately two years, suffered severe emotional distress, loss of income, reputational harm, and other damages.Under the law of Tennessee, Georgia, and North Carolina, a private person who initiated and continued a criminal prosecution under these circumstances would be liable in tort for malicious prosecution. Under 28 U.S.C. § 1346(b), the United States is liable to I for this tort.

**Count II – False Arrest and False Imprisonment**

43. Special Agent X procured an arrest warrant and search warrant by making material false statements and omissions in the probable cause affidavit, and by failing to conduct even a minimally competent investigation into Sayegh's accusations and Georgiadis's hearsay.

44. Relying on the defective warrant, federal agents arrested I at her residence in Tennessee and confined her in federal custody, including transport and holding in Tennessee and Georgia, before any valid, informed judicial determination of probable cause was made based on a complete and truthful record.

45. The federal employees intended to confine I , I was conscious of the confinement, she did not consent, and the confinement was not privileged because the warrant and supporting affidavit were constitutionally and legally invalid.

46. My liberty was restrained during the initial arrest and the ensuing period of custodial confinement tied solely to the defective warrant and false representations, prior to the entry of a valid detention order supported by full and accurate information.

47. As a direct and proximate result, I suffered loss of liberty, humiliation, emotional distress, and other damages.

48. Under the law of Tennessee and Georgia, a private person who caused a person to be seized and confined on the basis of a knowingly or recklessly defective warrant would be liable in tort for false arrest and false imprisonment. Under the FTCA, the United States is liable to I for this tort.

**Count III – Abuse of Process**

49. Special Agent Solomon, AUSA Pennington, and other federal employees intentionally used criminal process against I , including warrants, an indictment or information, detention orders, and conditions of release such as ankle monitoring and home confinement.

50. These federal employees used that process for improper purposes that were collateral to any legitimate law enforcement objective. Those purposes included suppressing My

truthful speech about Sayegh, protecting Sayegh from accountability, coercing I into a guilty plea that would validate the false narrative, and insulating federal officials from civil and professional liability for having advanced that narrative.

51. After seizing my electronic devices and records, the federal employees had direct access to recordings, messages, and other materials that corroborated My account and exposed Sayegh's fabrications. Despite this, they continued to invoke criminal process against I , resisted meaningful relaxation of her confinement, and withheld exculpatory evidence for an extended period while pressing for a plea.

52. The continued use of process after probable cause was destroyed, and for the collateral purposes described above, was an abuse of process under the applicable state laws.

53. As a direct and proximate result, I remained incarcerated and then rendered effectively housebound under strict conditions for many months, suffered severe emotional distress, incurred legal expenses, and lost income and opportunities.

54. Under the law of Tennessee, Georgia, and North Carolina, a private person who intentionally misused judicial process for such collateral aims would be liable for abuse of process. The United States is liable to I for that tort.

**Count IV – Trespass to Land and Conversion / Trespass to Chattels**

55. Acting on the defective search warrant described above, federal agents entered and searched My residence in Tennessee. Because the warrant was procured through material falsehoods and omissions, the entry and search were not legally justified.

56. The agents' entry into My home without valid authority constituted a trespass to land under Tennessee law.

57. During the search, federal agents seized My phones, computers, storage media, artwork, and other personal and professional property. The United States, through its employees, retained this property for an extended period, searched and copied its contents, and failed to return certain items or to return them in a timely manner.

58. The unlawful seizure, prolonged retention, and interference with my possession and use of her property constituted conversion and trespass to chattels under Tennessee law.

59. As a direct and proximate result, I lost the use of her property, suffered damage to or loss of certain items, and suffered emotional distress and disruption of her livelihood.

60. Under Tennessee law, a private person who entered another's home without valid authority and seized and held their property in this manner would be liable in tort. Under the FTCA, the United States is liable to I for these injuries.

**Count V – Negligence and Gross Negligence in Investigation and Evidence Handling**

61. Special Agent X and other investigative personnel owed I a duty to exercise reasonable care in investigating M's allegations, in evaluating the reliability of hearsay informants,

in drafting and presenting warrant applications and reports, and in preserving, reviewing, and disclosing electronic evidence seized from I  and third parties.

62. AUSA Pennington and other prosecutorial personnel owed I  a duty, under the standards of ordinary care applicable to private attorneys and investigators in analogous roles, to refrain from prosecuting her without probable cause and to exercise reasonable care in reviewing, evaluating, and disclosing exculpatory evidence in their possession.

63. These federal employees breached their duties of care by, among other things

a. Accepting and repeating Sayegh's and Georgiadis's accusations without basic corroboration,

b. Omitting readily available address, police, and electronic records that contradicted those accusations,

c. Failing to review or credit My recordings and documents in a timely manner, and

d. Withholding exculpatory evidence for many months while continuing to impose severe restraints on My liberty.

64. These breaches occurred in Tennessee, Georgia, and North Carolina and reflect, at minimum, negligence. Given the obviousness and gravity of the contradictions and exculpatory materials, the conduct also rose to the level of gross negligence or reckless disregard for my rights.

65. As a direct and proximate result, I was wrongfully arrested, prosecuted, detained, and confined, suffered severe emotional distress, incurred legal fees, and lost income and opportunities.

66. Under the laws of Tennessee, Georgia, and North Carolina, a private person who investigated and proceeded in this manner would be liable for negligence and gross negligence. Under the FTCA, the United States is liable for these damages.

**Count VI – Intentional Infliction of Emotional Distress**

67. At all relevant times, Special Agent X, AUSA Y, and other federal employees knew or had strong reason to know that I was a survivor of severe abuse and sexual assault by M and that the criminal case against her rested on accusations made by that abuser and his then-partner.

68. Despite that knowledge, they chose to arrest I in her home on a defective warrant, to search and seize her personal effects, to charge and publicly label her as a federal criminal based on her speech about that abuse, and to detain her in jail and under home confinement for an extended period.

69. After seizing and reviewing My communications and recordings, the federal employees knew or could not reasonably deny that M's core narrative was false and that My speech was truthful or, at minimum, not knowingly false. Yet they continued to maintain the

case, to restrict her liberty, and to press for a guilty plea while withholding exculpatory material.

70. Federal employees also engaged in further conduct toward I that was unnecessary to any legitimate governmental interest and served only to exacerbate her humiliation and fear, including continuing contacts about the case and about M while I remained in a vulnerable position.

71. This pattern of conduct, directed at a known abuse victim, was extreme and outrageous by any objective measure and exceeded all possible bounds of decency in a civilized community.

72. The federal employees intended to cause I severe emotional distress or acted with reckless disregard of the near certainty that their conduct would cause such distress.

73. As a direct and proximate result, I suffered severe and lasting emotional distress, including fear, anxiety, depression, sleep disturbance, trauma symptoms, and loss of enjoyment of life, in addition to the tangible harms described in the preceding counts.

74. Under the laws of Tennessee, Georgia, and North Carolina, a private person who engaged in this conduct toward another would be liable for intentional infliction of emotional distress. Under the FTCA, the United States is liable to I for this tort.

## VI. DAMAGES

75. As a direct and proximate result of the acts and omissions described above I has suffered

a. Emotional distress including debilitating anxiety, depression and humiliation.

b. Invasion of privacy and violation of the sanctity of her home

c. Economic losses including costs associated with property damage loss or seizure and expenses incurred in responding to the unlawful search and any resulting proceedings

d. Other damages to be proven at trial.

76. I has complied with all procedural prerequisites to suit and is entitled to recover damages from the United States to the same extent a private person in like circumstances would be liable under Tennessee law.

## VII. PRAYER FOR RELIEF

I requests that the Court enter judgment in her favor and against the United States and award

a. Compensatory damages in an amount to be determined at trial

b. Prejudgment and postjudgment interest as allowed by law

c. Costs of suit under 28 U S C section 2412 and other applicable provisions

d. Such other and further relief as the Court deems just and proper.

Respectfully submitted

Alia Saaed

218 Camelot Drive

Morganton, NC

28655